Good afternoon, Your Honors. Jens Kepke, Gwyneth Martin, appearing for appellants. I'd like to reserve seven minutes of my time for rebuttal. I think it's important to point out at the outset that the district court did not find here that Carroll Shelby or the defendants had any right to use the intellectual property to make these knockoff Eleanors. In fact, the only two bases that the defendants have ever asserted for how they have the right to do so evaporated at even cursory inspection. Number one, Carroll Shelby argues the remake mentions Shelby and the GT500 a few times in the remake in association with Eleanor. And somehow that gives the right to use Eleanor in Gone in Sixty Seconds. However, the remake Eleanor is not a GT500, and Carroll Shelby conceded as much of his deposition. In fact, Shelby had nothing to do with the creation of Eleanor, nothing to do with writing the script, nothing to do with designing the look of the car, and nothing to do with creating this 30 years of a brand. So that argument goes nowhere. The second argument that Shelby has proffered is, well, I registered a federal registration for Eleanor, so I have the rights. And again, he concedes that he did that because he says, Disney mentioned Shelby in the remake, and so I'm going to take Eleanor. They can sue me if they want. But we all know, Hornbook trademark law is that federal registration does not give you ownership of a trademark. You know, without the trademark copyright arguments, and there are arguments to be made in that respect, we have to look at what the district judge did. And the district judge basically said that you had no standing to sue because your client had signed away the rights in this agreement with Disney Studios and had nothing left to pursue because she got a royalty, gets a royalty from the movie, and all her other rights are gone. So where does the standing question come in, and what do you have to say about it? As to the agreement, Your Honor, I think that if we look at all of the evidence regarding the parties' mutual intention in entering that 95 agreement, it's very clear that the intention of the parties was that Hallecky retain the rights, the merchandising rights to the remake Eleanor, which are at stake here. And let me tell you why. We start out under California law looking at the circumstances surrounding the execution of the agreement. We've got to look at the language first, don't we, even under California law, the language of the agreement. Then let's start there, Your Honor. If we look at the language of the agreement, the thing that occurs most often in that agreement is that any right that's granted to Disney within that agreement is subject to Paragraph 5. In every substantive provision that grants rights to Disney, it is made subject to Paragraph 5, this reservation of rights. And in fact, Paragraphs 4 and 7 in that agreement only relate to the remake. So if the reservation of rights only had to do with the original Eleanor, which is what the defendants argue, there would be no reason to put those in Paragraph 4 and 7. And yet the phrase reads that the right to manufacture, so forth, merchandise using the car known as Eleanor from the original movie. And the district court decided that that meant only the Eleanor shown in the original movie. And that interpretation doesn't make sense if you look at the entire agreement, the circumstances surrounding the execution, and the extrinsic evidence about the mutual intention of the parties. Because at the time that this agreement was entered into, 1995, there was no remake Eleanor. There was no remake. It wasn't sure that Disney was going to make one. If it did, it wasn't sure that Eleanor would appear. I don't really understand how that helps you, in the sense that it was first of all contemplated that something was going to be made, or otherwise there wouldn't have been an agreement. And second of all, there was an original Eleanor. And it doesn't seem to me to tell you very much about what would have happened with another Eleanor. So I don't know why that helps you. I mean, I don't think it hurts you, but I don't know why it helps you, the fact that there was no – and it seems to me it can cut either way, the fact that there was at that point no other Eleanor. So what? Well, it helps to understand why the parties chose the language they did at the time. No, if they could have said the original Eleanor or any later Eleanor. And in hindsight, there are any number of ways that one can draft a provision. But all that needs to be shown here is that there's some genuine issue as to what the parties' intentions were. And if you look at – All right. So that's very helpful to get into what I want to get into. So let's assume that we think there's a genuine issue, given the extrinsic evidence, and given what I would characterize as a probably fair reading if this is at least ambiguous and so on. How does that – then what do we – we would then – you're not asking for summary judgment on that question. So we remand for trial as to the agreement. All right? Let's assume that for now. What happens to the rest of the case? You have all kinds of other arguments. And I can't tell whether they're alternative or contingent or what, how they fit together. I mean, as far as I can tell, just to start out, the derivative use thing, it doesn't seem to help anything. Because if the government – if the agreement is as the district court says it is, then there – the derivative use has been given away. And if it's not as it says it is, then you don't need this. Then you have the agreement. So do we have to get to that issue, the derivative use issue? No, Your Honor. You don't have to get to it. But isn't it totally irrelevant on either scenario? No, I don't think it's totally irrelevant. Why? Because if, in fact, the provision is as we argue it is, then when this case goes back down, the issue of the derivative rights will be at issue. And because the facts are undisputed, this Court can give the lower courts some guidance. Well, why would you be looking for a derivative remedy when you have the – when you have the direct copyright trademark remedy? I mean, it would seem to be inconsistent. On the trademark, I would agree with Your Honor. We do have a direct right. And that's another answer to Judge Berzon's question. The trademark issue here stands separate from the contractual interpretation issue. Whether or not, whatever this contract meant, Hallecky still has rights, the right and has standing to enforce these trademarks. So those go down. Even if the district court interpreted that agreement correctly, you think you could proceed on these other issues? Yes. Why? Because the trademark goes to the word Eleanor and the word gone in 60 seconds. Unless she gave it away. She didn't. Well, that's the question. No, no, no, no. The question – the question was whether there was a contractual reservation of rights of merchandising. That's just – there's no – there's no argument here that this agreement was a sale of some trademark, because it wasn't. At best, it was a license. It was a – it was a license. Yes, which means that the – Exclusive and permanent. Which means that the owner still has standing to pursue their trademark. Why? Because they're still the owner of the trademark. And it makes perfect sense here, because even if you take the district court – How would that be true of the copyright also if it were true? Because the copyright applies to – the copyright was owned as the original Eleanor and the original Eleanor character. And Disney owned the copyright to the remake. So there's a distinction there. The trademark, however, has never left the hands of Ms. Halicki. And so – Wait just a minute. Doesn't this agreement give up all intellectual property rights of any variety? No. It simply provides a license to use this intellectual property to make a remake. It holds back and reserves specific rights, which include, by the way, if you look at the reservation of rights, paragraph 5A. Well, I understand that. But that goes back to the agreement. But you're trying to argue that there's something that trumps the agreement with regard to the trademark. And there is. Because how – let me give you the best example of that. There's no dispute here that no matter how you look at this agreement, that Halicki retains the right to market, sell, distribute the original Eleanor and the original film in any way she pleases. To do that, she's going to use the marks. So clearly she – there's no way that she granted away all the rights to use the marks. Because she's going to use them in – with the original Eleanor now. So irrespective of how you construe the agreement – But the dispute here isn't over the original Eleanor, is it? The dispute here with Shelby is with the remake Eleanor. The dispute is with using the marks. And it happens to be that the defendants are using them with a replica, a knockoff of the remake Eleanor, but the dispute is over using the marks. And given that she retains ownership of those marks, she has a right to – has standing to sue over the infringement of those marks. So that is why the issue of trademark remains regardless of the contractual interpretation issue. Now, of course, one can reverse on just the contract issue, but that's up to this Court. This Court, I believe, should reach the trademark issue as well. Now, okay, to talk further about the trademark issue, in order to have a trademark cause of action, you have to have some competitive injury and likelihood of confusion. What is the likelihood of confusion about what? Because you're not producing a car. You don't have a car. Well, in fact, Hallecky is producing a car currently. More so, Hallecky was attempting to enter into agreements to produce a car. And so it's precisely the defendants' activities that – in flooding the marketplace with knockoffs that ruin that opportunity. So it really doesn't matter because if, you know, Universal Pictures or Steven Spielberg hadn't yet thought of the idea of creating a plush doll of E.T., that doesn't mean I can go out tomorrow and make an E.T. doll and say, well, you're not doing it, so I can do it. Right? That doesn't – that doesn't give them the right to do that. Likewise – Well, I don't know. I mean, that's my question, actually. I mean, you – he made a movie called – I'm asking a question. I understand there's also a dilution cause of action, but you're not alleging that. So if I have not made a – if I'm not in the market of – the doll market, I mean, it's true what you're saying sounds right, but I don't know how it fits in with trademark law. If I'm not – I'm just making movies. I'm not making dolls. Because trademark law brings with it the right to market merchandise products associated with your mark. And particularly when what we have here is a car character. But it's also true that if I have – I mean, the example is always used is Apple. I mean, if I'm making Apple computers, that doesn't give me a right to stop somebody else from making Apple drinks. But when you have – that's – that may be true, Your Honor. But when you have a movie character that is a car that you have – that you've invested in the marks of, one of the most obvious ways to merchandise that intellectual property is by creating either a toy or a life-size car. Well, what's the mark? It's far different than – Is the mark the name Eleanor, or is the mark the name Eleanor on a car, or is the mark – The mark is – the mark is Eleanor. So anything named Eleanor? No, that's not right. I wouldn't go that far. But we don't have to go that far, Your Honor. It clearly applies to an automobile that's patterned exactly after how the intellectual property was originally used, which is on a movie star character. So I don't think we have to even stretch the hypothetical. I can't remember. Did you say you wanted to save seven minutes, or was that your – Yes, I do, Your Honor. Okay. There's six minutes left. Okay. Well, I will save the remainder of my time for rebuttal unless there's a burning question. All right. Thank you, Your Honor. Thank you. Good afternoon. May it please the Court, Robert Helsing for the Shelby parties who are cross-appellants and cross-appellees. I want to address one question, though, that came up in the briefs and was also emphasized just now, which is that this is – that Ms. Hallecky somehow granted a license rather than assigned her rights or intellectual property rights to Disney or Hollywood Pictures. That's not correct. What she did was assign her rights. If you look at the contract, it's clear that Disney went to excessive lengths to make sure that whatever related to the remake, it would own. And the only thing that Ms. Hallecky was going to retain through the reservation was the right to the owner of the original motion picture. Why is that so clear? The exception phrase says, from the original motion picture, from the original, which the district court said that meant only the car shown in the original, but the word from is susceptible of meaning such as which has its source in or originally presented in. It doesn't say – it's not that clear, is it, in your mind? It is, Your Honor. If you look at the preamble of the contract where they state the purpose of it, it specifically stated that Disney is going to get all sequel and remake rights in the 1974 movie, the old movie, and any ancillary and subsidiary rights, and any underlying rights. Then if you look at the granting clause, and this is particularly telling, the granting clause which is in paragraph 4, it says that Disney is going to get specifically, irrevocably, throughout the universe, and in perpetuity, all right title and interest of every kind and nature in all languages. So it doesn't get anywhere. You just keep going around in circles when you do that. Actually, no, Your Honor, because what my point is, is that Ms. Hallecky is giving away the rights, but she's retaining one small sliver. She's carving out from the rights she's giving away one thing, and that is the rights to the Eleanor of the original motion picture. Well, wait a minute. In connection with that question, the district court was presented with some affidavits on a motion for reconsideration, and although the district court recognized the affidavit submitted by the attorney, I guess from Ms. Hallecky, he didn't recognize Ms. Hallecky's affidavit, or the affidavit presented on behalf of Disney indicating how they viewed this language. And doesn't the rule, isn't the rule here that that kind of information is supposed to be taken into consideration in contract interpretation? As I understand the California law. Your Honor, there was no affidavit from Disney. There were some declarations from Ms. Hallecky's attorneys. And from? And from herself. And an agreement from Disney. Correct. And the agreement. And in fact, Ms. Hallecky. With an affidavit saying why it was late. Right. And Ms. Hallecky, in fact, after the motion for summary judgment was granted, filed a motion for reconsideration and said, you didn't look at my evidence. You didn't look at my declarations. And the Court said, how do you know? In fact, I did do it. That's why I found that your interpretation is strained and absurd. And we do raise that point in briefs. The Court did look at those. Didn't that agreement come in later after that? It came in connection with the motion for reconsideration. Right. But later in time. That's correct. Several months later. But that, if you're talking about the acknowledgment that was drafted for Disney and was submitted in connection with the motion for reconsideration, that was just Disney's way of characterizing how it chose to interpret the language in 2005 of what it had done in 1995. It's not a statement of its own stature. You've got extrinsic evidence which illuminates the agreement. Is that right or wrong? Respectfully, Your Honor, that is not right. Because I don't believe that a document, a letter, in effect, manufactured for a motion is extrinsic evidence. It wasn't created at the time of the agreement. It was created specifically for this motion. That's not extrinsic evidence. That's just in the nature of an uncertified declaration. Let's go back to the agreement itself. You started with Paragraph 4. And what it says is that what is granted to HPC, solely exclusively throughout the universe and in perpetuity, is all right, title, and interest of every kind and nature in all languages in and to sequels to and or remakes of the property, including without limitation to the following subject, only to the reserved rights specifically set forth in Paragraph 5, which certainly indicates that the reserved rights specifically set forth in Paragraph 5 pertain to the sequels to and remakes of the property. Otherwise, there was no reason to do it, because the only thing that was granted was the rights to sequels and remakes, not to the original property. Well, Your Honor, I don't believe that's really the way this happened. I think Ms. Hallecky, when you read the contract, it's very clear that Ms. Hallecky was concerned with one thing obsessively and one thing only, and that was retaining the rights to the original 1974 Ford Mustang Mach 1 that was in that original movement. Right. But in Paragraph 5, she reserved two things. A, the original picture, and B, Eleanor. I'm sorry. B? It was Eleanor, separately. If you look at the reserved rights, they all relate to the original motion picture. All of them. Well, but why did you need B if you had an A, if it only pertained to the original picture? Why do you need Paragraph 5 at all? It all relates to the original picture. So why do you need it? If all Disney's getting is the rights to the remake, why do you need Paragraph 5 at all? It's completely unnecessary. Because, at least as to B, which is what is the issue here, it isn't only the original picture. It is the character in whatever transmogrification, transmogrified at least however transmogrified it might be later. Because the fact that she separated this out from everything else certainly suggests that she had something specific in mind. I think she did have something specific in mind, to keep the rights to that original Eleanor. But it's reasonably susceptible to another interpretation, is it not? I don't believe so. The Court didn't think so. And the language that or the evidence that the plaintiff submitted to show an ambiguity was found not to raise an ambiguity. But it was found in a summary judgment sense. So the question is, as Judge Minor is saying, if it's susceptible to another interpretation, then what the district court said is just not, doesn't matter. Well, here's what the interpretation that they attached to it. They're saying that the right, when you look at paragraph 5B, the right to manufacture, sell and distribute merchandise utilizing the car known as Eleanor from the original picture. That should be read as saying the car known as Eleanor from the original picture and any remakes of the original picture. That's the interpretation. Any car that's based on Eleanor. Based on Eleanor. Absolutely. They could have said you can reserve any rights to the trademark Eleanor. They could have said you reserve any rights to the trademark Eleanor regarding cars. But they didn't say that. Suppose it wasn't. And in the second picture, you say that if you reserve the rights to Eleanor from the original picture, that means if you change Eleanor and you call your Eleanor Eleanor, but you just paint a yellow stripe on it, that that's not using their Eleanor? That's correct, Your Honor. The difference here between the two Eleanors, I gather, is they were both the same naked car. There was a different year and a different color, essentially. Is that right? Different car, different looking car. Those are different cars. They were both Ford Mustangs. No. No, that's not correct, Your Honor. The car that was in the remake was a Shelby GT500. Which is a Ford Mustang redone. Right. Well, I wouldn't agree with that, but they look kind of similar, but it's not a Mustang. Was it used by Ford as a Mustang and then kind of fooled around with? It was a completely redesigned car by Shelby done in connection with Ford. I mean, just historically, completely redesigned car. It looked sort of like the Mustang, but it was a muscle version of it. A much better car, a different shaped car. It wasn't a Mustang. In fact, Shelby has described the Mustang as a car for secretaries. This is a car for racing buffs. I know. Mustang was a car for secretaries. Mustang was a pretty good car. It was. Well, I guess in Shelby's world, it's a big story. Am I correct in saying that the civil minutes in which the district court memorialized its decision on a motion for reconsideration referred only to the Weissman and Allen declarations and not to the Halicki declaration and not to the acknowledgment of agreement submitted in January? Isn't that right? I'm sorry, Your Honor. The order on the motion? The minutes of the motion or the judge's decision on the motion for reconsideration. I believe it referred to the – well, it definitely referred to the lawyer's declaration. The lawyer's. And I don't think it mentioned the Halicki declaration or the acknowledgment of agreement. Well, but that was specifically – that was the basis of the motion for reconsideration. So I would give Judge Attaro credit for having reviewed the evidence that it was based on. What about some of the questions I was asking before about just assume for a minute that we thought that there was enough evidence as to the agreement that it wasn't appropriate in summary judgment. What about the other issues? Is the derivative used in the beneficial interest? Well, let's take beneficial interest because we didn't talk about that before. I don't – it would be helpful to me for you to articulate your position about that because my understanding is we do have case law that says that if there's a royalty, then the person has a beneficial interest. And if you're right about the agreement, then they do get a royalty on the merchandise, right? So why don't they have a – why don't they have a beneficial interest? Because three reasons. Ms. Halicki gave away everything other than the right, this merchandising right. She said, I'm keeping this merchandise. No, but she has a right to a royalty. And a right to a royalty, but she disavowed any other rights. She specifically disavowed them. That would include the right to sue based on the trademark rights. Why? Because that's what she said. She said, I'm giving away all rights. In fact, she gave a power of attorney, an irrevocable power of attorney in Disney to sue based on rights. Yes, but it wasn't just – they said they can do it. They don't have to do it. It didn't say it was exclusive. A power of attorney is not exclusive. Well, let me address a couple of – I think I can address a couple of your concerns, including that one, by reading this language also at the end of paragraph 5. We've been talking whether this original motion picture can somehow reasonably be read to include rights from the remake. Well, just a minute, because this concern doesn't really have to do with that. Because this concern, as I understand it, is a statutory right of a beneficial owner, and she is under our case law, and she has a royalty right of beneficial owner, so why isn't that doing? With regard to both the copyright and the trademark. All right. Well, then let me address that one. I mentioned three reasons. One was that she gave away the right to sue because that's included in everything else that she gave away. So show me where that – where I get that from. Well, that was the language. I was just about to quote it. It's at the end of – well, let me start with this. Let's go back to the granting section, paragraph 4, where the rights are granted. Can you give me a page from the exit for the contract? That, I would have to fumble. It's in section 4, 791. Okay. It's paragraph 4C. If you look at the very end, the last sentence, it says, owner, that is Ms. Hallecky, shall have – shall not have any right, title, or interest whatsoever in or to any And then it gives a list of things including characters created by or for HPC in the exercise of HPC's rights here under. But we know that she, in fact, has a royalty interest. So this is an overstatement. It has to be because we know she has a royalty interest. So she has a royalty interest and she – Right. So she doesn't have no right, title, or interest. She has a royalty interest. So all that she has is a royalty interest. She doesn't have a right to sue. She has a royalty interest as a matter of statute. It gives her a right to sue. I'm having a hard time seeing why not. Because the contract is clearly designed to give Disney all the rights except what is carved out for Hallecky. But those are substantive rights. They're not – no one's talking about rights of enforcement or standing in lawsuits. Well, I would think that that flows exactly precisely from that substantive right. Where else would it flow from? Well, with regard to Eleanor, if Hallecky's position is correct, then her standing will be as the legal owner and not the beneficial owner. Is that right? She's not a legal owner because she's specifically assigned the right away. No, assuming that she reserved the right to Eleanor. If that reservation – Then there's no suing as a beneficial owner because she'd be the legal owner. That's correct. If that reservation is read as giving her rights in the remake, then she doesn't need to be a beneficial owner. On the other hand, if you're right about the agreement, then the derivative ownership doesn't matter. That's correct. Right? Because they're giving it away. Plus she gave away all the derivative rights. Right. That was the whole purpose of the agreement. That's the whole point of the agreement. Yes. So she gave it away to whatever extent she gave it away, so having derivative rights. So basically those two things, both the derivative right and the beneficial owner, depend on what we do with the agreement. Yes, that's correct. Whether they matter or not. Well, but there are other reasons why the beneficial rights don't apply, and I can go through them if you'd like. Well, what about the trademark issue? Do you want to talk about that specifically? This contention that the trademark somehow continues to live after no matter what is in this agreement. But she gave it away. The only thing she kept. The only thing she kept was the right to use that trademark in connection with, at least according to our interpretation, in connection with that car from the 74 movie. That's all. It all revolves around that question. I believe it does, Your Honor. Now, there is a cross-appeal. The cross-appeal has to do with the attorney fee, the denial of our motion for attorney's fees. If the court decides with Judge Otero, affirms the judgment, decides with Judge Otero that this contract unambiguously says what it says, then the lawsuit is essentially based on Ms. Halkey's representation that high-reserved rights or interpretation of the contract that Judge Otero described as absurd and strained. It's our position that for Judge Otero to reach that position and then to say that somehow there was a basis for this lawsuit, a good-faith basis, is inconsistent with that finding. How can it be said that there was at least a good-faith basis for it? Well, Your Honor, respectfully, I've read this contract many times. I cannot see how rights in Eleanor from the original picture can be read as rights in Eleanor in the original picture and in remakes. There is no reasonable way that it can be read that way, in my opinion. So that's what my appeal, cross-appeal, is based on. The standard, of course, is abuse of discretion and rewarding of fees. And the district judge gave a number of reasons why he thought they had at least an arguable case. Well, I don't know that he really explained it very much. He did say that there was a basis for it. He didn't explain what the basis was.  He didn't say it was based on any of these other issues that were raised. He just said there was a basis for it and sort of left it at that. Well, I think we've come to the end of the morning. Thank you, Your Honor. Thank you very much. Thank you. Your Honor, I think I reserved six minutes of time, and I still have them. Oh, yes. I know it's late in the day, but I have them. You don't have to use them. I don't have to, but I would like to make a few points. All right. Come, make a few points. Thank you, Your Honor. First, I do want to clear up. Your Honors are correct. These cars are all Mustangs. These are Ford Mustangs. In fact, the car used in the original Eleanor. . . Those are already secretaries. That's right. Sexy secretaries. The car used in the remake. . . And, in fact, even these knockoff Eleanors are made from standard fastback Mustangs. These are all Ford Mustangs. But to differ a little bit with you, Judge Minor, I think that it doesn't all come down to paragraph 5. I think we win on paragraph 5B. Maybe you should leave well enough alone. Maybe. But I do want to address the fact that the question of whether there's a beneficial copyright ownership was never answered here. And, in fact, it's plain and simple. She retained a royalty interest within this agreement, no matter how you construe it, and that provides a separate basis. Was that her answer? Maybe the district court never ruled on it. The district court ruled on it but didn't really address the authorities head on that say this is all you need. And from a trademark standpoint as well, that royalty interest provides a separate basis for standard. But if you're the legal owner, why do you need to be the beneficial owner? That's absolutely right, Your Honor. This is a secondary argument. You're absolutely correct. The other thing about the — Your Honor pointed to the extrinsic evidence. I think it's important to clear up here that that extrinsic evidence showed that both parties to this agreement agreed that the merchandising rights to the remake Eleanor were being reserved. But your adversary says that that agreement was just material prepared for litigation and should be disregarded. Well, if you look at the acknowledgment, it goes much further than that. It says the parties want to clarify their intentions in the 1995 agreement. They were very upfront that this was what they were doing. They clarified their intentions, and then they go on to say that as between Hallecky and Disney, Hallecky retained the merchandising rights to the remake Eleanor. You can't be too much clearer than that. And we have both parties to an agreement saying this is what it means. It's pretty hard to find that there isn't, at a minimum, a genuine — Unless they're trying to do something to a third party. Well, they have no interest in trying to do something to a third party. But Disney has basically acted compatibly with that. Absolutely. All the — There's some suggestion that Disney has, in fact, manufactured some remake Eleanor stuff. It happens. The only thing pointed to was this little collectible toy car set. It's not even clear from the record whether that ever was put in the marketplace. But what is clear is that there's no reference to Eleanor, and it doesn't even look like the Eleanor from the remake. So, no, the marketing prowess, the giant Disney sat by the sidelines here and didn't market this, that's notable. And it shows that Disney saw the contract the way they — Do you know whether Disney marketed anything else based on the movie? Yes. All kinds of merchandise was sold. I mean, it was their 15th highest grossing film. You can make sure that they wanted to merchandise it. And finally, I do want to note that if you look at this agreement, both in paragraph 11, it refers to the fact that this is a license, the grant, the signs to HPC and a license. Why does that matter? I'm missing something. It's probably some arcane point of special property law that I don't understand. But why does it matter if they gave a permanent irrevocable license for the whole universe, why does it matter what we call it? Because the licensor still retains rights, still has standing to sue about the property that's been granted. That's the difference. Both — when you have a license, it essentially means that both the licensor and the licensee — Because it's not. Because you're not selling it. You're holding on to the ability — Because it's the only person to whom you're licensing, but you could still be holding it on to yourself. And you might license it for other purposes to someone else. It's only exclusive license to make remakes and sequels here. That's all it is. Okay. The last — absolutely the last point I want to make is that you can't get around that paragraph 5A and 5B would be, as Judge Meyer pointed out, would be in conflict if the defendant's interpretation holds. There would be no reason to have 5B if all it was referencing was the original Eleanor, because 5A takes care of that completely. So the only — the only — and that's why it's — and it says right to continue to do something, which is the Eleanor. 5B doesn't talk about a right to continue to do something. It's referring to some other right, which is the remake Eleanor. Unless the Court has other questions, I will rest. Thank you, counsel. Thank you. The case just argued is submitted. Court will recess for the day.
judges: Reinhardt, Berzon, Miner